# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

MOLLY S. P.,[1]

      Plaintiff,

vs.

MARTIN O'MALLEY,
Commissioner of Social Security,

      Defendant.

No. 22-CV-4042-CJW-KEM

**REPORT AND
RECOMMENDATION**

———————————————

Plaintiff Molly S. P., proceeding pro se, seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Plaintiff argues that the ALJ erred in finding that she did not suffer from severe mental impairments, in evaluating the physical limitations caused by her back pain, and in developing the record. I recommend **reversing** the ALJ's decision and **remanding** for further proceedings.

## I. BACKGROUND

Plaintiff graduated from high school in 1992 in the Sioux City, Iowa, area. AR 250.[2] She worked as a pharmacy technician at a local Sioux City pharmacy, then at Target from 2007 to 2010, and then returned to the local pharmacy from 2010 to 2013. AR 46-47, 239, 241, 336-38. During this time, her work history was spotty, as some

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] "AR" refers to the administrative record below, filed at Docs. 14-2 to 14-16.

years, her earnings did not qualify her work as substantial gainful activity. AR 26, 239. She last engaged in substantial gainful activity in 2008. *Id.*

Long before her alleged onset date, Plaintiff suffered from depression and anxiety (since 1999), treated with lorazepam (a benzodiazepine) and zolpidem (Ambien) for sleep. AR 252, 898-99. She also suffered abdominal pain from endometriosis, which improved after she underwent a hysterectomy in October 2012. *See* AR 353, 359, 1194, 1198. It appears that Plaintiff initially began taking hydrocodone (an opioid) mostly for endometriosis pain. In February 2012, a treatment note reflects she took "hydrocodone all the time[] anyway" when discussing new knee pain caused by a fall while skiing. AR 894. After her hysterectomy, a November 2012 treatment note reflects that the Percocet prescribed for post-op pain "was too potent for her . . . , so she has been continuing the Norco" (hydrocodone/acetaminophen); the provider noted he gave the "last [prescription] of [N]orco" since her endometriosis had improved with surgery. AR 1194-95; *see also* AR 500 (Plaintiff reported in January 2014 being "on pain meds for back pain, joint pain, and endometriosis pain prior to her hysterectomy").

The first treatment note in the record in which Plaintiff complains of back pain is from a few months later in March 2013; at that time, she was no longer prescribed hydrocodone. *See* AR 896-901, 1201. She reported that her back pain began in October 2010 and included joint pain, muscle pain, and difficulty walking, but not extremity tingling or muscle weakness. AR 898, 901. Her Iowa primary care provider, physician assistant James Rusch, ordered a back x-ray and said to "cont[inue] meds," re-prescribing Norco (10 milligrams hydrocodone/325 milligrams acetaminophen) every 4 to 6 hours as needed for pain. AR 897. Plaintiff continued to complain of back pain at appointments in April, July, and October 2013. AR 902-07, 1208-12.

Plaintiff stopped working in October 2013 when she and her husband moved to Colorado for her husband's job. AR 47, 250. In January 2014, she established care with a primary care provider in Colorado, Jennifer Hepp, DO, who Plaintiff had previously seen when she lived in Colorado. AR 500. Dr. Hepp's treatment notes reflect a "past

2

medical history" of "suspected bipolar." AR 500. Plaintiff reported that her low back pain began after a fall in 2001 but did not get "real bad until the last few years"; and that lack of health insurance had prevented treatment. *Id.* She also complained of leg and hip pain. AR 500-01. Dr. Hepp performed osteopathic manipulation and prescribed Norco at the same dosage as before and cyclobenzaprine (Flexeril), a muscle relaxer. AR 500-03. Dr. Hepp ordered x-rays of Plaintiff's hips and lumbar spine and an MRI[3] of her lumbar spine, then referred Plaintiff to the Colorado Pain Clinic. AR 496-97, 502, 520-21, 822.

Plaintiff visited Joseph Fillmore, MD, at the Colorado Pain Clinic, from April 2014 to April 2017 on about a monthly basis.[4] Dr. Fillmore took over prescribing Plaintiff's narcotics. AR 708. At her first appointment, Plaintiff complained of a three-year history of low back pain, gradually worsening, and more recent onset leg pain. AR 709-10. Dr. Fillmore thought the mild facet arthropathy and disc bulge shown on the MRI at L4-5 could be impacting her nerve roots, causing pain. AR 709. Plaintiff received epidural steroid injections at L4-5 and facet joint injections into her lower back in May and July 2014, which helped only a little, and did physical therapy for her lumbar spine, progressing slowly. AR 697, 700, 705, 736. Dr. Fillmore noted Plaintiff's physical therapist believed her pain was a "combination of discogenic pain along with facet mediated pain." AR 702.

In August 2014, Dr. Fillmore referred Plaintiff to a spine surgeon ("Dr. Ibrahim"), who did not recommend surgery and who suggested Plaintiff might have "symptom magnification." AR 694, 699. Plaintiff requested a second opinion (and also

---

[3] Magnetic Resonance Imaging.

[4] Dr. Fillmore's treatment notes often copy-and-paste from his last visit and are sometimes clearly inapplicable (for example, saying that Plaintiff has an upcoming appointment with a specialist when the appointment has already occurred). I therefore focused on new statements in his notes that did not appear in the note for the prior visit.

3

had a psychological assessment at Dr. Fillmore's referral). AR 691, 694, 696.[5] In September 2014, Vikas Patel, the chief of orthopedic spine surgery at University of Colorado Health (UCH) Outpatient Services, recognized Plaintiff's "complex situation with quite severe tenderness and pain in her lower back," despite "minimal degenerative changes at L4-5" shown on the February 2014 MRI. AR 411-15. He thought Plaintiff's sacroiliac (SI) joints, rather than her lumbar spine, were the likely source of her pain, and he recommended SI joint injections to diagnose if Plaintiff's SI joints caused her pain. *Id.* Dr. Fillmore administered SI joint injections in November and December 2014, and Plaintiff began a second round of physical therapy, this time targeted to her SI joints, by March 2015. AR 673, 676, 684, 732-34. Plaintiff reported benefiting significantly from the first round of SI injections, and in March 2015, Dr. Fillmore reduced Plaintiff's hydrocodone dosage, tapering down more in the fall of 2015. AR 654, 675, 732. Plaintiff had a repeat SI injection in May 2015, stating that she found relief "at first" and that it gave her "some improvement but no resolution of pain." AR 487, 667, 730-31.

After a period of "feeling good," Plaintiff reported tingling and numbness in her left leg in December 2015; Dr. Fillmore performed another epidural steroid injection. AR 649, 724. In January 2016, Plaintiff continued to complain of SI joint pain (but did say her low back and left leg pain improved after the injection), and Dr. Fillmore returned to a higher dosage of Norco (7.5/325 milligrams four times a day) and recommended chiropractic treatment (which Plaintiff did). AR 483, 634, 637, 640, 642. Dr. Fillmore performed an epidural steroid injection in May 2016 and an SI joint injection in June 2016, which Plaintiff stated helped and provided "[s]ome mild improvement." AR 485, 600, 622, 625, 722. Plaintiff underwent MRIs of both hips in June 2016, ordered by Dr. Hepp after Plaintiff began complaining of increased hip pain. AR 485, 510-11.

---

[5] Treatment notes from physical therapy, Dr. Ibrahim, and the psychological assessment are not in the record.

4

In July 2016, Plaintiff started experiencing numbness and tingling in her right foot. AR 616. As a result of this new symptom, Dr. Fillmore ordered a new lumbar spine MRI. AR 613. The October 2016 lumbar spine MRI showed no significant changes from Plaintiff's February 2014 MRI. AR 552, 555-56. Dr. Fillmore sent Plaintiff for core strengthening physical therapy, and he also gave her a deadline to stop smoking, or he would stop prescribing narcotics (ultimately, Plaintiff did quit smoking briefly in January 2017, by Dr. Fillmore's deadline). AR 476, 604, 607. In November 2016, Plaintiff requested a surgical referral, reporting that her low back pain and groin pain had worsened in the last six months. AR 552, 586. Plaintiff met with orthopedic surgeon Roger Sung in December 2016. AR 552. Dr. Sung recommended a right-sided SI lidocaine-only injection as a way to diagnose whether an SI joint fusion would help Plaintiff's pain, noting that other injections had provided only "intermittent relief of symptoms." AR 552. He referred her to the Pain and Spine Clinic at St. Francis Medical Center for this injection, performed in late January with CT[6] guidance by William Lippert, MD. AR 423-26, 552.

In mid-March 2017, Plaintiff reported that the injection improved her back pain by 50% but that she was experiencing new burning pain down the back of her leg and groin, as well as numbness in her left thigh. AR 545, 577. Dr. Fillmore noted Plaintiff was visibly uncomfortable and could not sit still, and he increased her hydrocodone dosage (to 10/325 milligrams four times a day). AR 578. A few days later, Dr. Sung prescribed a one-time steroid (Medrol Dosepak) and ordered a repeat lumbar spine MRI due to Plaintiff's new radicular complaints of burning left thigh pain (which Plaintiff underwent a few days later). AR 544-45. In late March, Plaintiff had a follow-up appointment at the Pain and Spine Clinic with physician assistant Mark Stafford. AR 746. Based on her response to the lidocaine-only SI injection, he scheduled her for a right SI joint rhizotomy with Dr. Lippert, a minimally invasive surgical procedure in

---

[6] Computed Tomography.

which the nerve endings are burned off to stop them from sending a pain response to the brain. AR 746, 842.[7] PA Stafford noted that if the rhizotomy did not help, they would consider an SI joint fusion surgery. AR 746. He also started Plaintiff on gabapentin and gave her a one-time prescription for Dilaudid (hydromorphone) to last her until the rhizotomy. *Id.*

Plaintiff received an epidural steroid injection from Dr. Fillmore in mid-April. AR 588-89. Dr. Fillmore also stopped prescribing her narcotics, as her drug screen from March 2017 was positive for morphine (no prescription) and a controlled substances database revealed PA Stafford's hydromorphone prescription, which violated Plaintiff's pain contract with Dr. Fillmore. AR 575. In late April, Plaintiff met with Dr. Lippert for the right-sided rhizotomy (which he indicated had a no greater than 50% efficacy rate). AR 744. Dr. Lippert's treatment note reflects that he had a lengthy discussion with Plaintiff and her husband about her care, which boiled down to Plaintiff's husband being dissatisfied that she had been treated for three to four years in Colorado without improvement—treatment that had included narcotics, multiple rounds of physical therapy, chiropractic manipulation, acupuncture, cupping, a TENS[8] unit, an inversion table, an SI belt, heat, and an orthopedic shoe lift for possible leg length discrepancy. *Id.*; *see* AR 410, 423, 604, 634, 703; *see also* AR 975 (email from March 2017 reflecting that Plaintiff had submitted her MRI to the Laser Spine Institute to see if any unexplored surgical options existed). Dr. Lippert noted he found Plaintiff's hydrocodone dosage excessive, and he provided her with a prescription for Norco at a much-reduced dosage (5/325 milligrams twice a day). AR 744. He also increased her gabapentin dosage. *Id.* He performed the right-sided rhizotomy, as well as a left femoral temporal nerve block in the hope to improve Plaintiff's left thigh pain. *Id.*

_____

[7] *See also Holly S. v. Kijakazi*, No. 3:20-CV-1632 (ATB), 2022 WL 1775712, at *11 n.13 (N.D.N.Y. June 1, 2022).

[8] Transcutaneous Electrical Nerve Stimulation.

After the rhizotomy and nerve block, there is a four-and-a-half-month gap in the treatment notes in the record, other than a May 2017 visit to urgent care in Sioux City after a fall down the stairs. AR 755-57. Plaintiff reestablished primary care with PA Rusch in Iowa in mid-September 2017. AR 909. Plaintiff updated a form listing her medications, noting mental-health and sleep medications included lorazepam, zolpidem, and Prozac (fluoxetine, an SSRI[9]), the last of which Dr. Hepp had begun prescribing in August 2015; and that pain medications included Norco (10/325 milligrams four times a day), gabapentin (300 milligrams three times a day), and Flexeril (10 milligrams three times a day), all prescribed by Dr. Hepp. AR 487-89, 913.[10] PA Rusch took over prescribing these medications at these dosages. AR 910, 912.

There is another gap in the treatment notes of record, with the next appointment reflected in the record with PA Rusch in March 2018. AR 917-20. Plaintiff reported feeling manic, and PA Rusch discontinued fluoxetine and prescribed sertraline (Zoloft, an SSRI) instead. *Id.* PA Rusch also noted he would refer Plaintiff to the Mayo Clinic at her request for her back pain. *Id.* When Plaintiff continued to complain of back pain at an appointment the next month, PA Rusch referred her to the Siouxland Pain Clinic. AR 925.

In early June 2018, Plaintiff met with Jeremy Poulsen, DO, at the Siouxland Pain Clinic. AR 887-89. Plaintiff noted a long history of low back pain, as well as left leg radicular pain that had started about a year ago. *Id.* She noted that both her back pain and left leg pain improved after the right SI joint rhizotomy and left femoral temporal nerve block in April 2017 and that she had been "doing well until just recently." *Id.* She requested a left femoral temporal nerve block and left SI joint injection, which Dr. Poulsen performed in July and August 2018, respectively. AR 882-89. A few weeks

---

[9] Selective Serotonin Reuptake Inhibiter.

[10] Although this form is dated March 2013, it appears to be a scanned copy of a form Plaintiff filled out for PA Rusch in March 2013, then updated with the treatment she had received in Colorado. *Compare* AR 898-901, *with* AR 913-16.

7

after the SI injection, Plaintiff met with PA Rusch, complaining that she still suffered from back pain and that the Pain Clinic's treatment was not working. AR 927-30. She also noted stress because of her chronic pain, and PA Rusch increased her sertraline dosage. *Id.* PA Rusch also ordered a new lumbar spine MRI (which Plaintiff noted Dr. Poulsen had suggested). *Id.*

Plaintiff's date last insured for DI benefits was September 30, 2018. AR 19. On October 10, 2018, Plaintiff received a lumbar spine MRI, which did not show substantial change as compared to the October 2016 MRI. AR 980-81. Plaintiff additionally underwent MRIs of the cervical spine and thoracic spine in late November 2018. AR 831-33. Treatment notes from PA Rusch and Dr. Poulsen throughout the first half of 2019 reflect that Plaintiff continued to complain of back and left thigh pain, the latter of which Dr. Poulsen noted coincided with the bulge shown on the lumbar spine MRI at L4-5; he concluded this left L4 nerve root impingement was the likely cause of her radicular pain. AR 861, 870. These treatment notes also reflect several complaints of falls. *See* AR 856, 870, 877, 936, 947. Because Plaintiff experienced new burning radicular pain into both legs after one such fall, Dr. Poulsen ordered a new lumbar spine MRI, which continued to only show bulging or abnormal findings at L4-5 that was stable as compared to the October 2018 MRI. AR 856-58, 1168-69. Dr. Poulsen prescribed meloxicam in February 2019 and encouraged Plaintiff to decrease her hydrocodone dosage, noting that she could be developing increased tolerance, rendering it less effective. AR 856, 872. From January to June 2019, Dr. Poulsen administered various injections (epidural steroid injections, SI joint injections, and a left femoral nerve block), culminating in a bilateral SI joint rhizotomy. AR 846, 859, 863, 872, 881.

Treatment notes in the record from the latter half of 2019 and all of 2020 reflect sporadic appointments with PA Rusch; as related to Plaintiff's back pain, PA Rusch decreased the amount of Norco prescribed from 120 pills a month to 100 pills a month in August 2019; noted that Plaintiff continued to complain of hand, back, and left knee pain in July 2020 and was having a difficult time getting into the Mayo Clinic; and

8

referred Plaintiff to physical therapy and a neurosurgeon for back pain at her request in November 2020.  AR 958, 1235, 1242, 1247.

In early 2021, Plaintiff established care with nurse practitioner Jeannie Franklin for psychiatric medication management.  AR 1143-51, 1279-93.  Plaintiff also met with a neurosurgeon ("Dr. Schumacher") and returned to Dr. Poulsen at the Siouxland Pain Clinic; it appears both recommended surgery to place an electronic nerve stimulator in Plaintiff's back, and according to Plaintiff and her husband, both providers refused to answer questions and became upset with them, with Dr. Poulsen becoming angry when they asked about further SI joint injections instead (these treatment notes are not in the record, but Plaintiff discussed the encounters with both PA Rusch and NP Franklin, noting she was now "looking for other options in order to try and get the nerve stimulator" since she "burned . . . bridges" with the neurosurgeon and Dr. Poulsen). AR 1148, 1249.  Plaintiff then met with orthopedic surgeon Kevin Liudahl, MD, in mid-February 2021, who concluded Plaintiff and her husband really wanted "another SI differential injection," treatment he did not do; so he referred them to a pain clinic in Omaha (about an hour and a half away from Sioux City).  AR 1227-29.  In mid-April 2021, PA Rusch noted he had reduced Plaintiff's hydrocodone dosage from 10 milligram tablets to 7.5 milligram tablets and she was "unhappy about that"; he returned to the higher dosage, referred Plaintiff for physical therapy for her back and leg pain (which she did), and encouraged Plaintiff to follow-up with Dr. Liudahl about the Omaha referral.  AR 1182-92, 1264-66.

Plaintiff filed the current application for DI benefits in early August 2019 (after the second rhizotomy), alleging disability based on "severe middle to lower back pain, pain that radiates down both legs, general weakness and prone to falling, [sacroiliac] joints are bad, multiple injections and nerve ablations, pinched nerve in left groin, burning pain in left leg, anxiety, depression, [and] restless leg syndrome."  AR 72.  She alleged disability since October 31, 2013, when she stopped working and moved to Colorado.  *Id.*  The Social Security Administration denied her application initially in May

9

2020 and on reconsideration in September 2020. AR 71-86. In connection with those reviews, state agency consultants Vincent Marziano, PhD, and Aaron Quinn, Phd, reviewed the treatment records and found Plaintiff did not suffer mental limitations affecting her ability to work; and Chrystalla Daly and Laura Griffith, DO, evaluated Plaintiff's physical limitations, opining she could perform sedentary (sitting) work with other limitations. AR 74-76, 82-85.

At Plaintiff's request, the ALJ held a telephonic administrative hearing on July 19, 2021. AR 17, 41-42. Both Plaintiff and a vocational expert (VE) testified at the hearing. *Id*. The ALJ issued a written opinion on August 4, 2021, following the five-step process outlined in the regulations[11] to determine whether Plaintiff was disabled at any time between her alleged onset date on October 31, 2013, through her date last insured on September 30, 2018. AR 17-30. The ALJ found that Plaintiff suffered from severe impairments of degenerative disc disease of the lumbar and cervical spine and obesity;[12] the ALJ found Plaintiff's depression and anxiety nonsevere. AR 19-20. To aid in the

---

[11] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." *Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. § 404.1520(a)(4)**. The claimant bears the burden of persuasion to prove disability. *Goff*, 421 F.3d at 790.

[12] Plaintiff had a healthy weight at the time of her alleged onset date in October 2013. *See* AR 903. She fluctuated between 130 and 149 pounds in 2014, 2015, and most of 2016, which as a person who is 5 feet, 3 inches tall, gave her a "normal" or slightly "overweight" Body Mass Index (BMI), but not "obese." *See* AR 497, 501, 606, 610, 641, 674, 677, 705, 708, 710*; see also* AR 1257 (some records reflect Plaintiff is 5 feet, 2 inches tall). She began gaining weight in late 2016, around the time she reported worsening low back and groin pain and requested a referral to Dr. Sung. *See* AR 575, 578, 581, 583, 586, 603, 756. She steadily gained weight in the spring of 2017 (when she was complaining of increased pain and ultimately underwent the first rhizotomy), hitting 171 pounds and raising her BMI to "obese" in mid-March 2017. *Id.*; *see also* AR 476 (complaining of weight gain in March 2017 and stating she did not think it was related to higher fluoxetine dosage). Her weight hovered around 180 pounds from May 2017 through her date last insured in September 2018. *See* AR 756, 911, 919, 928, 1047.

step-four and -five determination, the ALJ determined Plaintiff's residual functional capacity (RFC),[13] finding Plaintiff could perform light work—which includes the ability to lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently,[14] and to stand, walk, and sit approximately six hours in an eight-hour day[15]—with the following additional limitations:

> [Plaintiff] was able to perform work that required no climbing of ladders, ropes or scaffolds; no more than occasional climbing of stairs or ramps; frequent but not constant balancing; and occasional stooping, kneeling, crouching and crawling. Additionally, [Plaintiff] required the opportunity to alternate between sitting and standing, such that after approximately 30 minutes sitting, [Plaintiff] would need to be able to stand up for approximately 5 minutes, or alternatively, after approximately 30 minutes standing, [Plaintiff] would need to be able to sit for approximately 5 minutes. During these position changes, [Plaintiff] could remain at the work station and [be] productive.

AR 22. In the hypothetical to the VE, the ALJ described the shifting-positions portion of this RFC as not requiring the person "to maintain a fixed position for more than 30 minutes," then said "it would essentially be a job where they could do it sitting or standing, really," and then reiterated it could require standing or sitting for up to thirty minutes at a time. AR 64. Relying on VE testimony, the ALJ found Plaintiff could not perform her past relevant work but could work as a cashier, rental clerk, or office clerk. AR 29-30. Thus, the ALJ found Plaintiff not disabled from October 31, 2013, through September 30, 2018. AR 30.

---

[13] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

[14] Occasionally is a term of art meaning "very little up to one-third" (or two hours) of an eight-hour workday. *See Dictionary of Occupational Titles (DOT)*, App. C, IV.c; *see also, e.g.*, **Social Security Ruling (SSR) 96-9p**, 61 Fed. Reg. 32278, 34480 (July 2, 1996). Frequently means one-third to two-thirds (or six hours) of an eight-hour day. *See DOT*, App. C, IV.c; *see also, e.g.*, **SSR 83-10**, 1983-1991 Soc. Sec. Rep. 24, at 29-30 (CCH Jan. 1, 1983).

[15] **20 C.F.R. § 404.1567(b)**; **SSR 96-9p**, 61 Fed. Reg. at 34481-82.

The Appeals Council denied Plaintiff's request for review on June 23, 2022 (AR 1-4), making the ALJ's decision that Plaintiff was not disabled the final decision of the Commissioner.[16] Plaintiff filed a timely complaint in this court on August 26, 2022 (Doc. 1).[17] The parties briefed the issues (Docs. 1, 21, 22, 25, 26), and the Honorable C.J. Williams, Chief District Judge for the United States District Court for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II. DISCUSSION

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[18] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[19] The court "do[es] not reweigh the evidence or review the factual record de novo."[20] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[21]

Plaintiff, proceeding pro se, points to many issues with the ALJ's opinion. Her arguments can be grouped into three main categories, challenging (1) the ALJ's finding that her mental impairments were not severe, (2) the ALJ's physical RFC assessment, and (3) the ALJ's development of the record.

---

[16] *See* **20 C.F.R. § 404.981**.

[17] *See* **20 C.F.R. § 422.210(c)**.

[18] *Grindley*, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[19] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

[20] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

[21] *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

### A. *Severity of Mental Impairments*

During step two, the ALJ determines the claimant's medically determinable impairments and whether those impairments are severe.[22] An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities"—for example, the ability to "[u]nderstand[], carry[] out, and remember[] simple instructions; . . . [u]se . . . judgment; . . . [r]espond[] appropriately to supervision, co-workers and usual work situations; [or] . . . [d]eal[] with changes in a routine work setting."[23] An impairment is not severe if it "would have no more than a minimal effect on the claimant's ability to work."[24] "Severity is not an onerous requirement for the claimant to meet" (and has been described as a de minimus standard[25]), "but it is also not a toothless standard."[26]

To evaluate the severity of a mental impairment, the ALJ applies a "special technique," evaluating the claimant's limitations in "four broad functional areas . . . : [u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."[27] Although subject to exception, as a general rule, if the claimant suffers no more than mild limitations in each category, the claimant's mental impairments are not severe.[28] The ALJ must consider "the quality and level of [the claimant's] overall functional performance, any episodic limitations, the

---

[22] **20 C.F.R. § 404.1521**.

[23] **20 C.F.R. § 404.1522**.

[24] *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003) (quoting *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001)); *see also* **20 C.F.R. § 404.1520a(d)(1)**.

[25] *Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989).

[26] *Kirby*, 500 F.3d at 708.

[27] **20 C.F.R. § 404.1520a(a), (c)(3)**.

[28] **20 C.F.R. § 404.1520a(d)(1)**.

amount of supervision or assistance [the claimant] require[s], and the settings in which [the claimant is] able to function."[29]

Here, the ALJ recognized Plaintiff suffered from the "medically determinable mental impairments of anxiety and depression" but concluded they "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere." AR 20. The ALJ applied the special technique for mental impairments and found Plaintiff suffered from mild limitations in concentrating, persisting, or maintaining pace, and no limitations in the three other categories. *Id.*

The ALJ noted mental status examinations before the date last insured in September 2018 were mostly normal, with appropriate mood and affect and normal orientation and memory. AR 20; *see* AR 374, 488, 542, 552, 603, 736, 769, 773, 888, 894, 897, 907, 911, 920, 925, 1205; *but see* AR 424, 480, 903, 929. Plaintiff's primary care providers (PA Rusch and Dr. Hepp) prescribed her psychiatric medications during the relevant time period. Although the "subjective complaints" section of their treatment notes reflect that Plaintiff often noted anxiety or depression, Plaintiff's mental health was rarely mentioned in the main parts of the treatment note. In December 2012, shortly after her hysterectomy (and prior to her alleged onset date), Plaintiff complained of feeling very emotional, anxious, and tearful, with passive suicidal ideation; the provider noted the mental deterioration was likely hormone-related and adjusted her estrogen dosage. AR 1199, 1201. In August 2015, Plaintiff told Dr. Hepp she had "ok" energy and was "[n]ot opposed to trying something else but [wa]s feeling fine with what she [wa]s doing"; Dr. Hepp added Prozac (fluoxetine) for anxiety with the hope to "cut back on lorazepam" in the future. AR 487, 489. At her next appointment with Dr. Hepp in March 2016, Plaintiff noted she had been feeling more stressed and was not sure if the Prozac dosage was strong enough; Dr. Hepp increased the dosage. AR 483, 485. She next saw Dr. Hepp in August 2016 and reported the increased Prozac dosage was helpful

---

[29] **20 C.F.R. § 404.1520a(c)(2)**.

but felt she would benefit from an even higher dosage, and Dr. Hepp again increased the dosage. AR 479, 482, 486. Plaintiff told Dr. Hepp in March 2017 that she had recently suffered from an anxiety attack lasting an hour and that her mood was better on the higher dosage of Prozac. AR 476. In March 2018 (after she had returned to Sioux City and PA Rusch took over managing her medications), a treatment note reflects Plaintiff reported feeling very manic and was concerned her medications were not working; PA Rusch discontinued Prozac and started another SSRI (sertraline) instead. AR 917, 920. The next month, she continued to assert her bipolar disorder was out of control, and PA Rusch increased her sertraline dosage. AR 922, 925. She did not meet with PA Rusch again until August 2018, when she reported that sertraline was not working well enough at the current dosage and that she was having a great deal of stress about her chronic pain; PA Rusch increased her sertraline dosage again. AR 927, 929. PA Rusch's treatment records do not reflect that she complained of mental-health problems at her next two appointments (after the date last insured), other than stating she suffered from anxiety in the review of systems during one appointment. AR 931-39.

The ALJ also noted that in April 2020 function reports completed by both Plaintiff and her husband, they stated Plaintiff had no issues with memory, concentration, understanding and following instructions, paying attention, getting along with others, or handling changes in routine; the only mental limitation they reported was not handling stress well. AR 21, 267-68, 279-80. At the hearing in July 2021, Plaintiff testified that she had problems paying attention and staying focused; and that she suffered some panic attacks and difficulty concentrating, but her depression and suicidal thoughts was what was really bad now and why she started seeing NP Franklin. AR 51, 60-61. The ALJ noted that when Plaintiff established care with NP Franklin in early 2021, Plaintiff reported worsening depression and that her memory was becoming problematic. AR 20, 1145, 1279. Thus, the ALJ noted that it appeared Plaintiff's mental symptoms increased after her date last insured. AR 20. For this reason, the ALJ did not find NP Franklin's opinion of Plaintiff's mental limitations persuasive, as NP Franklin did not begin treating

15

Plaintiff until more than two years after her date last insured, when her symptoms had worsened. AR 20, 341-46.

Overall, substantial evidence supports the ALJ's determination that Plaintiff's mental impairments would cause no more than minimal limitations on her ability to perform basic work activities during the relevant time period. Plaintiff and her husband did not self-report mental limitations such as an inability to pay attention in April 2020, before her symptoms worsened; Plaintiff's mental-health treatment during the relevant time period consisted of (at most) medication-management appointments every five to six months; and mental objective status examinations were mostly normal.

Plaintiff suggests that the ALJ "used his own opinion" instead of relying on a medical source. Doc. 25. But the state agency psychological consultants' opinions were consistent with the ALJ's determination. AR 74, 82-83.[30]

Plaintiff also argues that the ALJ should have contacted NP Franklin to ask whether Plaintiff's mental limitations existed prior to the date last insured and whether they stemmed from some traumatic event prior to the date last insured. Doc. 21. Plaintiff argues that if the ALJ had further developed the record, treatment notes would have shown that her mental issues existed "as far back as 2012 or earlier." Doc. 1-1. But the ALJ recognized that Plaintiff had been diagnosed with depression and anxiety; the ALJ found that these impairments were effectively managed with medication such that they would not impose limitations on Plaintiff's ability to work during the relevant time period. Indeed, there is evidence Plaintiff was diagnosed in 1999, after which time she engaged in substantial gainful activity.

---

[30] *See Bowers v. Kijakazi*, 40 F.4th 872, 875-76 (8th Cir. 2022) (holding that ALJ did not err in relying on opinions of state agency physicians, who examined only the medical records and not the claimant, when their opinions were more consistent with the objective medical evidence—showing routine treatment every six months and normal objective examinations—than the treating doctor's opinion).

Plaintiff argues that she suffers from limitations in interacting with others, noting that she testified that she had a panic attack when she worked at Target and had to take medical leave for four months due to a mental breakdown. AR 61; Doc. 25. She also argues further evidence of these limitations would have been shown in treatment records from 2003, about a decade before her alleged onset date. Doc. 25. The treatment notes from the relevant time period reflect only one report of a panic attack, and it does not appear tied to social interactions. Plaintiff and her husband both stated she had no issues interacting with others, and Plaintiff testified at the hearing she did not have difficulties getting along with people. AR 51. Substantial evidence supports the ALJ's finding that Plaintiff does not suffer from social limitations.

Finally, Plaintiff argues that the ALJ did not mention that he had to repeat several questions during the hearing, which Plaintiff argues is evidence of her inability to understand and pay attention. But as noted, the ALJ found that Plaintiff's mental condition had worsened by the time of the hearing (almost three years after the date last insured). And other evidence of record, more relevant to the time period at issue, supports that Plaintiff suffered at most mild limitations in her ability to concentrate, persist, and maintain pace.

I recommend affirming the ALJ's finding that Plaintiff did not suffer severe mental impairments prior to September 30, 2018.

### B. Physical RFC

Plaintiff points to several errors in the ALJ's analysis of her physical RFC. The ALJ found that Plaintiff would be able to lift twenty pounds occasionally and ten pounds frequently; and sit and stand for a total of six hours each, as long as she could alternate positions for five minutes every thirty minutes (plus additional limitations). AR 22.

The ALJ relied on the mild MRI findings of Plaintiff's lumbar spine. AR 25. Plaintiff underwent three lumbar spine MRIs prior to her date last insured (in February 2014, October 2016, and March 2017), as well as additional lumbar spine MRIs in

17

October 2018 (within two weeks of her date last insured) and April 2019. AR 544, 555-56, 822, 980-81, 1168. The MRI findings were stable through the years with no appreciable changes. *Id.* They showed a mild disc bulge at L4-5, which Dr. Patel believed was not the likely source of Plaintiff's pain, while Drs. Fillmore and Poulsen found it could be impinging her nerve root, especially because the disc bulge's location correlated with the radicular pain to her left leg. *Compare* AR 413, *with* AR 709, 722, 724, 856, 861, 870. The radiologists who interpreted the MRIs similarly disagreed on what they showed:

- Two radiologists noted "mild bilateral degenerative facet arthopathy" or "mild degenerative change of the facets" at L4-5, while one noted "minimal degenerative changes of the L4-5 disc space" with normal "facet joints."

- One radiologist found "mild to moderate bilateral foraminal stenosis"; one found "minimal inferior neural foraminal stenosis"; one found "borderline narrowing of the left L4 foramen, probably not currently significant," and "no central stenosis"; and one found no stenosis.

- One radiologist concluded there was "slight impingement of the bilateral exiting L4 nerve roots," while another concluded there was "[n]o evidence of nerve root impingement."

AR 544, 555-56, 822, 980-81, 1168.[31] Dr. Patel, Dr. Sung, and PA Stafford all suggested that Plaintiff's SI joints caused her pain, which would be consistent with a normal MRI; that condition would instead be diagnosed through Plaintiff's response to SI injections. *See* AR 413-14, 552, 746.[32] On the other hand, two doctors suggested

---

[31] These differences cannot be explained by the passage of time, as arguably the most severe findings are from the February 2014 MRI.

[32] To the extent Plaintiff argues that the ALJ erred in failing to find she suffered from SI joint dysfunction or sacroiliitis at step two, rather than degenerative disc disease, any error is harmless because the ALJ considered Plaintiff's back pain and its limitations on her ability to function when determining her RFC for steps four and five. *See Carpenter v. Astrue*, 537 F.3d 1264, 1265-66 (8th Cir. 2008) ("any error" in determining severe impairments at step two "became

that the severity of Plaintiff's pain was inconsistent with the MRI findings: Dr. Ibrahim noted Plaintiff might have symptom magnification, and Dr. Poulsen noted in January 2019 that Plaintiff complained of low back pain "out of proportion to the amount of findings on her radiographic studies," and he noted in April 2019 that Plaintiff complained after a fall of pain "down . . . the left L3 dermatome," but the MRI showed no possible cause for L3 or L2 involvement. AR 694, 856, 877.

The ALJ also relied on objective physical examinations. The ALJ concluded that back and leg examinations showing full strength and normal range of motion were "not suggestive of the extreme limits alleged, such as lifting only 3 pounds." AR 25. The ALJ was correct that providers always observed normal strength and extremity movement. AR 602, 606, 610, 617, 623, 626, 629, 632, 635, 638, 641, 644, 647, 650, 653, 656, 658, 662, 668, 671, 674, 677, 689, 692, 695, 698, 705, 708, 710 (normal extremity movement); AR 542, 545, 552, 575, 610, 888, 924 (normal strength). But not very many treatment records during the relevant time period reflect testing for range of motion, and the majority that do reflect decreased range of motion or pain with range of motion. AR 366, 542, 552, 888, 911, 924; *see also* AR 857, 862, 871, 878, 903, 907, 933 (decreased range of motion or pain with range of motion observed in the months shortly before and after the relevant time period). In the ALJ's summary of the treatment notes, the only objective exam the ALJ mentioned is from Dr. Poulsen's first appointment with Plaintiff in June 2018, which the ALJ described as "generally unremarkable." AR

---

harmless when the ALJ reached the proper conclusion that [the claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence"); *Harris v. Astrue*, No. 4:10-CV-2198 (CEJ), 2012 WL 785493, at *7 (E.D. Mo. Mar. 9, 2012) (holding that although ALJ erred in determining fibromyalgia was not a severe impairment, the error was "not significant because there was minimal difference in the functional symptoms between the conditions the ALJ found severe" and fibromyalgia (footnote omitted)); *cf. Parker v. Astrue*, No. 12-1212-SSA-CV-W-MJW, 2013 WL 3968767, at *3 (W.D. Mo. July 31, 2013) (finding reversible error when ALJ not only improperly failed to find hyperactive bladder condition was a severe impairment, but also failed to consider the condition and its symptoms in determining the claimant's RFC).

25, 888.  But Dr. Poulsen noted pain with range of motion of the lumbar spine, a positive left straight leg test, and several positive tests on the left side related to SI joints, including compression, Patrick-Fabere, Gaensien's sign, and pelvic rock (this last one was also positive on the right).  AR 888; *see also* AR 502 (Dr. Hepp observed positive hip rock test on the left at her first appointment in January 2014).

Indeed, the treatment notes are replete with abnormal results on objective examination, which goes unmentioned by the ALJ.  Providers often noted that Plaintiff appeared visibly uncomfortable due to pain.  AR 492, 495, 502, 708, 746; *see also* AR 497 (additionally noting shifted in chair frequently); AR 575 (could not sit still); AR 708 (leaned forward and to the left); *but see* AR 485 (appeared normal); AR 658, 680, 683 (noting she appeared more comfortable sitting).  While Plaintiff's gait was mostly found to be normal, providers noted an antalgic gait or slow, stiff gait on a handful of occasions. *Compare* 412, 495, 502, 542, 547, 550, 610, 617, 623, 626, 629, 632, 635, 638, 641, 644, 647, 650, 653, 656, 658, 662, 668, 674, 677, 680, 683, 692, 701, 705, 710, 888 (normal gait), *with* AR 485, 497, 689, 695, 698, 911 (abnormal gait).  Providers almost always observed tenderness on palpation to Plaintiff's back.  AR 412, 424, 485, 497, 502, 545, 552, 602, 632, 668, 701, 710, 744, 746, 924; *see also* AR 903, 907, 1211 (pre-onset date); *but see* AR 542.  A few objective examinations also reflect swelling or muscle spasms.  AR 497, 502, 903; *see also* AR 555 (October 2016 MRI suggested muscle spasm).

The ALJ also relied on the "routine" and "conservative" nature of Plaintiff's treatment, noting that no provider ever recommended back surgery and concluding that Plaintiff's "treatment is mostly just pain medications."  AR 25-26.  The limited number of times a claimant seeks treatment and the conservative nature of treatment may be appropriate factors, among others, for the ALJ to consider in discounting a claimant's

subjective reports of disabling pain.[33]  On the other hand, a claimant's subjective pain complaints are supported by "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources."[34]

Here, during the relevant time period, Plaintiff took medications including narcotics, gabapentin, and muscle relaxers; and when providers attempted to taper her narcotics dosage, they eventually returned to the higher dosage because of Plaintiff's pain complaints.  Plaintiff's medications largely remained the same, however, and she had not tried other medications like Lyrica, Cymbalta, or Celebrex (although there is no evidence any provider recommended these medications).  *See* AR 423.  In addition to medications, Plaintiff's treatments during the relevant time period included multiple rounds of physical therapy, chiropractic manipulation, acupuncture, cupping, a TENS unit, an inversion table, an SI belt, heat, a hemorrhoid pillow, an orthopedic shoe lift for possible leg length

---

[33] ***Singh v. Apfel***, 222 F.3d 448, 453 (8th Cir. 2000) ("A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications."); *see also **Milam v. Colvin***, 794 F.3d 978, 985 (8th Cir. 2015) ("conservative treatment history" consisting of medication and exercises and almost two-year gap in seeking treatment after alleged onset date inconsistent with complaints of disabling back pain); ***Smith v. Shalala***, 987 F.2d 1371, 1374-75 (8th Cir. 1993) (failure to seek "medical treatment for his back on a regular basis" and treatment of "only muscle relaxers and mild pain relievers" inconsistent with disabling pain); ***Robinson***, 956 F.2d at 840 (conservative treatment of physical therapy, muscle relaxants, over-the-counter pain medications, and heat was inconsistent with disabling pain, especially when record demonstrated claimant did not always take pain medications).

[34] **SSR 16-3p**, 81 Fed. Reg. 14166, 14170 (Mar. 16, 2016); *see also **Singh***, 222 F.3d at 450, 453 ("repeated and consistent visits to doctors"; taking and trying "numerous prescription medications"; and trying "many pain treatment modalities including chiropractic treatments, nerve blocks, a TENS unit, and . . . undergo[ing one] surgery and many diagnostic tests" not inconsistent with disabling pain complaints); ***Kelley v. Callahan***, 133 F.3d 583, 589 (8th Cir. 1998) (holding that "numerous visits to doctors"; taking "many prescription medications"; "avail[ing] herself of many pain treatment modalities, including a TENS unit, physical therapy, trigger point injections of cortisone, chiropractic treatments, and nerve blocks"; "several surgeries"; and "many diagnostic tests, including X-rays, CT scans, DNA tests, MRIs, and blood work" was not inconsistent with claims of disabling pain).

discrepancy, multiple injections (including epidural steroid injections, SI joint injections, and femoral temporal nerve blocks), and a right SI joint rhizotomy (a minimally invasive surgical procedure). She consulted with three different orthopedic surgeons (Drs. Ibrahim and Patel in fall 2014; and Dr. Sung in winter 2016), none of whom recommended surgery,[35] and explored other minimally invasive surgical procedures by submitting her MRI to the Laser Spine Institute online (in March 2017); saw two different pain specialists in Colorado and one in Iowa (Drs. Fillmore, Lippert, and Poulsen); underwent a hip MRI in June 2016 and lumbar spine MRIs in February 2014, October 2016, March 2017, and a few days after her date last insured in October 2018; and tried to get into the Mayo Clinic to see specialists there about her pain. Substantial evidence does not support the ALJ's conclusion that Plaintiff's treatment has consisted mostly of pain medications.

The ALJ seemed to question whether Plaintiff had ever participated in physical therapy, noting "[s]he often reports physical therapy, but the record does not contain evidence of this." AR 25. It is true that the record does not contain treatment notes from Plaintiff's participation in physical therapy during the relevant time period. But substantial evidence does not support that she did not participate in physical therapy:

- Dr. Fillmore referred Plaintiff for physical therapy for her lumbar spine in May 2014; a treatment note from Dr. Fillmore in June 2014 reflects that Plaintiff was "going to PT at Synergy" and "making slow progress" and that her physical therapist "feels her pain is discogenic"; a June 2014 treatment record from Dr. Hepp reflects that Plaintiff was in physical therapy; a July 2014 treatment record from Dr. Fillmore reflects that Plaintiff "brought in [her] physical therapy report," which said she was

---

[35] Plaintiff argues that because Dr. Sung suggested an SI joint fusion depending on the results of the rhizotomy, he recommended the fusion surgery; but there is no follow-up appointment in the record where Dr. Sung (or any provider) recommends the SI joint fusion be performed based on the results of the injections and rhizotomy.

"only progressing slowly"; and another July 2014 treatment note from Dr. Fillmore states she "has been undergoing physical therapy, but appears to not be progressing any further." AR 493, 700, 703, 706, 736.

- Dr. Fillmore referred Plaintiff for physical therapy for her SI joints in December 2014; Dr. Fillmore's treatment notes reflect that Plaintiff had not yet started physical therapy in January 2015; that Plaintiff complained of hip pain that "PT feels is related to her posture" in February 2015; that Plaintiff was progressing well in physical therapy with plans to continue for the next eight weeks in March 2018; that "PT is still helping" or that Plaintiff "is coming along in PT" in April, June, July, and August 2015; and that Plaintiff reported not having been to physical therapy in October 2015. AR 649, 661, 664, 670, 673, 676, 679, 684.

- Dr. Fillmore referred Plaintiff to physical therapy for core strengthening and flexibility in September 2016; a treatment record a month later notes Plaintiff would restart physical therapy at Synergy on October 27, 2016. AR 604, 607. Dr. Fillmore also referred Plaintiff for six to eight visits of pelvic physical therapy "per PT" in November 2016. AR 587. A December 2016 form Plaintiff completed for Dr. Sung reflects that she heard about Dr. Sung through her physical therapist and that he could thank Kevin Haddock at Synergy PT for the referral (while acknowledging that Dr. Fillmore was the referring physician). AR 535.

- Dr. Sung's early April 2017 treatment note reflects that Plaintiff reported she would start physical therapy in two days. AR 542.

At the very least, it is clear that Plaintiff participated in lumbar spine physical therapy in 2014, SI joint physical therapy in 2015, and some physical therapy in the fall of 2016. An ALJ has a duty "to develop the record fairly and fully, independent of the claimant's

burden to press his case."[36]  The ALJ could not find that Plaintiff did not participate in physical therapy simply because those treatment records are missing, without making any effort to obtain those treatment records.

The ALJ noted treatment records in which Plaintiff acknowledged that "pain medications improved her symptoms." AR 26.  The ALJ concluded that "medications were relatively effective in controlling the claimant's symptoms." *Id.* Although Plaintiff reported that medications helped, no treatment records reflect that Plaintiff's pain was well controlled with medications.  Plaintiff did report "feeling good" in the summer of 2015, after undergoing SI joint physical therapy and receiving SI joint injections, but later in the year she continued to complain of back pain and underwent more treatments (such as receiving injections and visiting the chiropractor).  She also reported doing well for about a year after her April 2017 rhizotomy (and did not seek much treatment during that time) but began consistently seeing providers and complaining of back pain again beginning in March 2018.

The ALJ also found the activities of daily living Plaintiff reported in function reports to the Social Security Administration in April 2020 were inconsistent with a more limited RFC.  *See* AR 26.  The ALJ found Plaintiff could care for pets and her personal needs, prepare her own meals, perform some household chores, drive, shop, watch television, and walk around flea markets.  *Id.* The ALJ relied on Plaintiff's report that she is able to feed and water her cats, and depending on how she feels, change their litterboxes, although sometimes her husband had to do that.  AR 263.  She reported a typical day includes brushing her teeth and hair, changing clothes, and showering every other day, but later in the same form said that sometimes her husband helps her with dressing and hair care, that she sits in the shower to bathe, and that she is able to shave by going slow and sitting in the shower.  *Id.* She reported that she only makes easy meals

---

[36] ***Combs v. Berryhill***, 878 F.3d 642, 646 (8th Cir. 2017) (quoting ***Vossen v. Astrue***, 612 F.3d 1011, 1016 (8th Cir. 2010)).

24

like sandwiches and frozen meals, which take less than six minutes, because depending on how she feels, standing and cooking "gets to be too much." AR 264. She reported cleaning and doing laundry and dishes "sometimes," "depend[ing] on how [she] feel[s]," and never ironing, mowing, or doing yard work or household repairs, noting that "[it's] a lot when I'm bending down constantly" and that it was "too much" to push a mower. AR 263-65. Plaintiff admitted to being able to drive and to shop for "clothes, flowers, [and] small amount[s] of groceries," noting that she had to "walk slow" and make sure items were not too heavy. AR 265. She said her hobbies included watching television and movies, which is "easy," and walking around flea markets and malls shopping, which "takes a long time." AR 266.

"Significant daily activities may be inconsistent with claims of disabling pain,"[37] but the ALJ must consider the claimant's limitations in performing these activities and their "quality, frequency, and independence."[38] Here, when the claimant's qualifications to her activities of daily living are considered (unmentioned by the ALJ), what she can do does not necessarily support the ALJ's finding that she could stand and walk for six hours a day, day in and day out, as long as she was allowed to take a five-minute sitting break every thirty minutes. On the other hand, substantial evidence does support the ALJ's finding that Plaintiff's activities of daily living reported in April 2020 are inconsistent with some of the extreme limitations in Plaintiff's July 2021 testimony and PA Rusch's March 2021 medical opinion. *See* AR 50, 54 (Plaintiff testified that she could sit for only fifteen minutes at a time and be on her feet for twenty minutes at a time and denied any activities that required walking without a cart to lean on or walking more than a block and back); AR 1152-53 (PA Rusch opined that Plaintiff could sit for only fifteen minutes before changing positions, for a total of less than two hours in a day; that

---

[37] *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

[38] *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).

she could only stand for five minutes at a time; and that she would have to walk around every five minutes).

The ALJ also noted Plaintiff's "spotty work history even prior to her alleged onset date" and that she reported quitting her part-time pharmacy job because she moved to Colorado, not because of her impairments (the date she stopped working is her alleged onset date). AR 26. A claimant's poor employment history suggests that unemployment may not be the result of the claimant's medical impairments, and the ALJ may consider work history as one factor among many when determining whether the claimant is disabled.[39] Plaintiff argues that substantial evidence does not support the ALJ's conclusion regarding her poor work history, pointing to a statement from her boss at the local Sioux City pharmacy (indicating that she missed work frequently) and her testimony at the hearing (that her husband took the job in Colorado to offset her loss of income from not working as much due to her pain). AR 47, 336-38. But in her initial DI application completed in March 2020, she denied quitting because of her disability, stating instead that her husband got a job out of state and they moved, and then her symptoms flared up more and she could not find work she could do. AR 250. In addition, Plaintiff reported that her back pain largely did not begin until 2010, but there are years prior to that in which she did not engage in substantial gainful activity (e.g., in 2005 and 2009). AR 26, 239. The ALJ did not err in considering Plaintiff's work history.[40]

---

[39] *See Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016).

[40] As noted, Plaintiff's former boss at the local Sioux City pharmacy submitted a form answering questions about her employment there. AR 336-38. The employer form notes that Plaintiff was absent frequently, often for an entire workweek; that she would often leave before the end of her shift; and that she was "probably" off task due to sitting forty-five minutes a day (despite being given a break every two hours and "an opportunity to sit between breaks"). *Id.* When asked if Plaintiff missed work due to her condition or symptoms, Plaintiff's former employer responded that although she missed work often, "her condition was not expressed." *Id.* The ALJ found that this statement provided further support for Plaintiff's "spotty work history," rather than proving that her back pain would cause her to miss work. AR 27. Although Plaintiff's absences from this job may have been related to something other than her condition,

Plaintiff argues that the ALJ "used his own opinion" and that no evidence supports that she can sit and stand for the amount of time found by the ALJ. The ALJ's RFC determination must be supported by at least some medical evidence from a medical professional that "addresses the claimant's ability to function in the workplace."[41] Here, as the ALJ acknowledged, no medical professional opined that Plaintiff could perform light work (as found by the ALJ). AR 28. PA Rusch opined that Plaintiff could sit for less than two hours total during the day and stand and walk for about two hours. AR 1152. PA Rusch also indicated in January 2021 when excusing Plaintiff from jury service that she could not sit for an entire day with breaks every two hours for multiple days in a row. AR 1278. The state agency consultants opined that Plaintiff could sit for six hours total in a day, but only stand and walk for two hours total; and they also found Plaintiff could not lift more than ten pounds (sedentary work). AR 75-76, 84-85. The ALJ, by contrast, found Plaintiff could stand, walk, and sit for a total of six hours in a day and could lift twenty pounds occasionally (light work). The ALJ stated that even if he found Plaintiff "capable of only sedentary work," like the state agency consultants, it "would still be a denial." AR 28. But there is no VE testimony to support that if Plaintiff were limited to sedentary work, along with the other limitations found by the ALJ, that jobs would exist—the three jobs found by the ALJ are all light work. *See* AR 29-30, 64-68. I have previously recognized that "[t]he ALJ may not impose fewer limitations than found in all the medical-opinion evidence and thereby formulate his own medical opinion."[42]

---

that she was sitting during the times she was off task suggests that she had difficulty being on her feet for lengthy periods as required for this job.

[41] *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).

[42] *Hall v. Saul*, No. 19-CV-3019-LTS-KEM, 2020 WL 5229539, at *6 (N.D. Iowa May 27, 2020) (collecting cases), *report and recommendation adopted,* 2020 WL 3121226 (June 12, 2020).

Overall, I do not find that substantial evidence supports the ALJ's RFC determination, particularly the findings that at all times during the relevant time period, Plaintiff could stand or walk for six hours in an eight-hour day and lift twenty pounds occasionally, as required for light work. I agree with Plaintiff that the ALJ relied too heavily on the relatively mild MRI findings and lack of surgical treatment options, while ignoring positive physical examinations, medical opinions, and treatments Plaintiff did pursue. I recommend reversing and remanding for further proceedings.

### C. Development of the Record

Plaintiff argues that the ALJ should have further developed the record and obtained clarification on RFC opinions from her former coworkers and treating providers, missing treatment records from the relevant time period (including from Dr. Ibrahim and physical therapy), and missing Omaha treatment records from 2021. Docs. 21, 25. Social Security hearings are nonadversarial, and an ALJ has a duty to fully and fairly develop the record.[43] The ALJ need not obtain additional opinion evidence unless "a critical issue was underdeveloped such that the ALJ's decision was not supported by substantial evidence."[44] Similarly, the Eighth Circuit has held that "reversal due to failure to develop the record" and obtain missing medical records "is only warranted where such failure is unfair or prejudicial."[45]

---

[43] *Combs*, 878 F.3d at 646.

[44] *Kruger v. Colvin*, No. C 13-3036-MWB, 2014 WL 2884038, at *2 (N.D. Iowa June 25, 2014) (adopting report and recommendation); *see also* **20 C.F.R. § 404.1519a(b)** (Social Security Administration may purchase a consultative examination "to try to resolve an inconsistency in the evidence" or "when the evidence as a whole is insufficient" to resolve the claim).

[45] *Twyford v. Comm'r, Soc. Sec. Admin.*, 929 F.3d 512, 517 n.3 (8th Cir. 2019) (holding that remand was not required when the record was missing "the operative notes from [the claimant's] surgery" but contained a "doctor's notes from a follow-up appointment after the surgery"); *cf. Cox v. Apfel*, 160 F.3d 1203, 1209 (8th Cir. 1998) (remanding when the record did not contain any pain clinic treatment notes "for the seventeen months prior to the [ALJ] hearing," nor any

I have already found that substantial evidence does not support the ALJ's RFC determination and that the ALJ erred in suggesting Plaintiff did not participate in physical therapy simply because those treatment notes were not in the record. But I do not necessarily find that on remand, the ALJ need to obtain missing treatment records or opinion evidence (although Plaintiff is free to submit such evidence). Dr. Fillmore's treatment notes (which are in the record) describe Plaintiff's physical therapy and Plaintiff's recitation of her appointment with Dr. Ibrahim. No other treatment records discuss the results of the psychological referral, made after Dr. Ibrahim suggested Plaintiff had "symptom magnification," but Plaintiff does not allege she was ever diagnosed with a somatoform disorder (the likely purpose of the referral). Treatment records from 2021 are long after the date last insured and would not shed much light on Plaintiff's condition from October 2013 through September 2018. As for the opinion evidence, the ALJ gave other reasons for discounting PA Rusch's opinion besides the fact that PA Rusch did not state his opinion was limited to the relevant time period; and substantial evidence supports the ALJ's determination that Plaintiff's mental health appeared to have worsened by the time she first met with NP Franklin, long after her date last insured (such that further clarification from NP Franklin would not have changed the outcome).

### III.    CONCLUSION

I respectfully recommend **reversing** the decision of the Social Security Administration and **remanding** for further proceedings.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which

---

treatment notes after the claimant's knee surgery showing the claimant's "recovery or the success of post-operative physical therapy").

Case 5:22-cv-04042-CJW-KEM    Document 28    Filed 04/24/24    Page 29 of 30

objections are made, as well as the parts of the record forming the basis for the objections.[46]  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[47]

       **SO ORDERED** on April 24, 2024.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[46] **Fed. R. Civ. P. 72**.

[47] *See* **United States v. Wise**, 588 F.3d 531, 537 n.5 (8th Cir. 2009).